B.S.G. FOODS, INC.,
William A. Thurman, and Bill Thurman, Jr. *v.*
MULTIFOODS DISTRIBUTION GROUP, INC.

CA 00-1390                                         54 S.W.3d 553

Court of Appeals of Arkansas
Division III
Opinion delivered September 5, 2001

*Everett Law Firm,* by: *John C. Everett* and *Elizabeth E. Story,* for appellants.

*Wright, Lindsey & Jennings LLP,* by: *J. Andrew Vines,* for appellee.

L ARRY D. VAUGHT, Judge. This is an appeal from an order granting partial summary judgment in favor of appellee. Appellants, William A. Thurman and Bill Thurman, Jr., contend that the trial court erred as a matter of law in finding that personal guaranties executed by them to Leprino Foods for credit given to B.S.G. Foods extended to appellee Multifoods Distribution Group, who acquired the assets of Leprino Foods through an asset-purchase agreement. We affirm.

The facts of this case are undisputed. From 1992 until 1998, appellants, William A. Thurman and Bill Thurman, Jr. ("the Thurmans"), operated B.S.G. Foods, Inc. ("BSG"), a pizza manufacturing company. BSG purchased food and supplies from Leprino Foods Co. ("Leprino Foods") to prepare frozen pizzas. On July 13, 1993, William Thurman executed a personal guaranty for items purchased by BSG from Leprino Foods. The guaranty provided:

> For good and valuable consideration, the undersigned jointly and severally guarantees unconditionally the prompt payment of any and all credit that may be extended to BSG Foods Inc. by Leprino Foods Company from the date of the agreement until ten (10) days after receipt by Leprino Foods Company, at 1830 West 38th Avenue, Denver, Colorado 80211-2200, of written notification of the

undersigned's desire to terminate this guaranty as to any credit extended after such notification. It is understood and agreed that credit is to be extended by Leprino Foods Company on a continuing basis, and Leprino Foods Company shall not be obligated to notify the undersigned of the dates or amounts of any such credit extended. The undersigned hereby waives demand, notice of default, and any extension of time of other forbearance which may be extended by Leprino Foods Company. The undersigned agree, jointly and severally, to pay in addition to the indebtedness hereby guaranteed, interest on said indebtedness at the rate of 18% per annum or the maximum allowable rate, whichever is less, from the date on which the indebtedness becomes due up to and including the date of its payment in full together with interest as promised herein, and reasonable costs of collection including attorney's fees. This Guaranty has been delivered at Denver, Colorado, and shall be construed in accordance with and governed by the laws of the State of Colorado.

Bill Thurman, Jr., executed an identical personal guaranty on August 27, 1993.

On July 29, 1994, appellee Multifoods Distribution Group, Inc. ("Multifoods"), acquired the assets of Leprino Foods pursuant to an asset-purchase agreement. BSG then began to purchase food and supplies from Multifoods and eventually became indebted to Multifoods. As a result of the indebtedness, BSG executed a promissory note to Multifoods in the amount of $70,691.60. BSG made payments totaling $22,455.37 and was given a credit of $4,416.12. In addition, BSG purchased $16,420.87 in products. At the time BSG defaulted on the note, it owed Multifoods $64,204.65.

Multifoods filed suit against BSG to recover the amount due under the note and against the Thurmans based on the personal guaranties they signed in 1993 in favor of Leprino Foods, plus $9,643.50 on a special food order. The trial court granted a motion for judgment on the pleadings with respect to BSG's liability on the promissory note. Multifoods then filed a motion for summary judgment on the Thurmans' liability on the promissory note and the special food order claim. The trial court granted partial summary judgment in favor of Multifoods, finding that the Thurmans were personally liable for the amount due on the note based on the personal guaranties they executed in favor of Leprino Foods. However, the trial court found that summary judgment was not appropriate on Multifoods's special food order claim because issues of fact remained. Multifoods nonsuited the special foods order claim, and ·

appellants appealed the trial court's grant of partial summary judgment, contending that the law does not support the trial court's findings.

■■ Summary judgment is to be granted by a trial court only when there are no genuine issues of material fact to be litigated, and the moving party is entitled to judgment as a matter of law. *Majors v. American Premier Ins. Co.*, 334 Ark. 628, 977 S.W.2d 897 (1998). Where the pertinent facts of the case are undisputed, we simply determine on appeal whether the appellee was entitled to summary judgment as a matter of law. *Id.*

■■ The Thurmans argue that they are not personally liable because the personal guaranties executed by them in favor of Leprino Foods do not extend to the amount due under the promissory note executed by BSG Foods in favor of Multifoods. In the recent case of *Morrilton Sec. Bank v. Kelemen*, 70 Ark. App. 246, 16 S.W.3d 567 (2000), we discussed the obligation of a guarantor:

> A guarantor, like a surety, is a favorite of the law, and her liability is not to be extended by implication beyond the expressed terms of the agreement or its plain intent. *National Bank of Eastern Arkansas v. Collins*, 236 Ark. 822, 370 S.W.2d 91 (1963); *Moore v. First National Bank of Hot Springs*, 3 Ark. App. 146, 623 S.W.2d 530 (1981). A guarantor is entitled to have her undertaking strictly construed and she cannot be held liable beyond the strict terms of her contract. *Inter-Sport, Inc. v. Wilson*, 281 Ark. 56, 661 S.W.2d 367 (1983); *Lee v. Vaughn*, 259 Ark. 424, 534 S.W.2d 221 (1976). Any material alteration of the obligation assumed, made without the consent of the guarantor, discharges her. *Wynne, Love & Co. v. Bunch*, 157 Ark. 395, 248 S.W.2d 286 (1923); *Continental Ozark, Inc. v. Lair*, 29 Ark. App. 25, 779 S.W.2d 187 (1989).

*Id.* at 247-48, 16 S.W.3d at 568. Further, alteration of a guaranty agreement is not material unless the guarantor is placed in the position of being required to do more than his original undertaking. *Vogel v. Simmons First Nat'l Bank*, 15 Ark. App. 69, 689 S.W.2d 576 (1985).

■■ Guaranties are divided into two classes, general and special. A general guaranty is addressed to persons generally and may be enforced by anyone to whom it is presented. 38 AM. JUR. *Guaranty* § 17. A special guaranty is one addressed to particular persons and may not be enforced by any person other than to

whom it is addressed. *Id.* In *Periman v. Rogers,* 187 Ark. 565, 61 S.W.2d 59 (1933), the supreme court discussed special guaranties:

> At § 52 of Stearns on Suretyship (3d ed.), page 64, it is said: "A guaranty is special when it is addressed to a particular person, firm or corporation, and, when so addressed, only the promisee named in the instrument acquires any rights under it." . . .

> At 16 of the chapter on Guaranty in 28 C.J., page 897, it is said: "A special guaranty is one which is addressed to a particular person who alone can take advantage of it, and to whom only the guarantor can be held responsible; it usually, but not necessarily, contemplates a trust or reposes a confidence in the person to whom it is addressed."

*Id.* at 567, 61 S.W.2d at 59. Appellants suggest that the guaranties they executed are special guaranties because they were specifically addressed to Leprino Foods and did not contain "successors and assigns" language, indicating that they could be enforced by Leprino Foods' successor or assigns. Based on these facts, they contend that the guaranties are not enforceable by Multifoods and suggest that *Periman v. Rogers* is controlling.

In *Periman v. Rogers,* J.G. Rogers entered into a lease agreement with Butler & Sons to rent a gas station. Rogers's payment of rent was guaranteed by three men pursuant to a written contract. Rogers became ill and Ladd took possession of the property. During Ladd's possession, Butler & Sons sold the property to Hays and Periman. Ladd defaulted on the lease payments; Hays and Periman sued Rogers and his guarantors to recover past due rents. A default judgment was obtained against Rogers and one guarantor. The trial court entered a judgment in favor of the two other guarantors, which was affirmed on appeal, finding that the guaranty was special and only addressed the original lessors and did not run to their heirs or assigns.

Appellants' reliance on *Periman* is misplaced because an assignment of the guaranties was not at issue. There was no indication that Butler & Sons assigned the written contract signed by three men guaranteeing Roger's payment of rent when it sold the property to Hays and Periman. In the present case, Multifoods acquired the assets of Leprino Foods pursuant to an asset-purchase agreement, which included the guaranties signed by the Thurmans. Thus, the court reached its decision in *Periman* without deciding whether a special guaranty can be assigned.

In addition to *Periman v. Rogers*, appellant also cites *Flying J, Inc. v. Booth*, 773 P.2d 144 (Wyo. 1989). In *Booth*, the appellees Jacqueline and Elvin Booth owned one-half of the outstanding shares of Booth Livestock, Inc., which operated a truck stop named Husky Super Stop. Before Husky Oil Co. would extend credit to Booth Livestock on fuel purchases and other products, Husky required appellees to personally guarantee the payment of any obligation incurred by Booth Livestock. Appellees executed the guaranty, and Husky supplied Booth Livestock with products used to operate the truck stop. In 1983, the Booths subsequently sold their one-half interest to Joan and Paul Gillett, who already owned the other half. The Gilletts were allowed to continue to purchase products on credit from Husky based on personal guaranties they executed in 1984. In May 1984, Husky sold its assets to RMT Properties, which was acquired by Big West Oil Co. in December 1985. Big West then assigned its assets to its wholly owned subsidiary Flying J, Inc., appellant therein. In 1985, Booth Livestock, then owned wholly by the Gilletts, defaulted on payments due. Appellant sued the Booths and the Gilletts to recover under the guaranty. Before the Gilletts were served with the complaint, Paul Gillett died and Joan Gillett filed for bankruptcy.

The Wyoming Supreme Court found that the guaranty signed by appellees was a special guaranty since it was addressed to only one creditor, Husky. The court then addressed whether the guaranty was assignable, holding that it was not. Speaking of the guaranty agreement, the court stated:

> That language expressly and clearly indicates that the relationship and intent of these parties was rooted in appellees' reliance on Husky's ability and willingness to perform its contract with BL [Booth Livestock]. A guaranty expressly given in consideration of the extension of future credit by a specific individual is generally held to be non-transferable. . . . Even where obligee sells his business and his successors continue to extend credit, the guarantor is liable only for debts resulting which accrued prior to the transfer of the original obligee's assets but not after.

*Id.* at 148. The Wyoming court declined to join the other courts which permit the assignment of special guaranties in the absence of actual prejudice to the guarantor.

In support of its argument, appellee relies on *Kraft Foodservice, Inc. v. Hardee*, 340 N.C. 344, 457 S.E.2d 596 (N.C. Sup. Ct. 1995), where the North Carolina Supreme Court upheld an assignment of

a special guaranty. In *Kraft*, Charlie Hardee was the president of Quick Fill, Inc., which operated convenience stores. Quick Fill submitted an application in June 1984 to Seaboard Foods, Inc., in Rocky Mount to purchase restaurant supplies and other merchandise on an open account. Hardee signed a personal guaranty for the account, promising to pay any amounts owed by Quick Fill for goods sold and delivered on the open account. After receiving the credit application and the guaranty, Seaboard began to sell merchandise to Quick Fill. In December 1995, Seaboard sold and assigned substantially all of its assets, including its Rocky Mount warehouse and Hardee's personal guaranty to Kraft, Inc. Kraft continued to sell merchandise to Quick Fill on the open account guaranteed by Hardee. Kraft then merged with General Foods, Inc., in 1989, forming Kraft General Foods, Inc. In December 1990, certain corporate assets, including the Hardee guaranty, became vested in appellee Kraft Foodservice. The corporate changes did not affect Quick Fill's ability to purchase goods on the open account.

In January 1991, Quick Fill filed a petition for bankruptcy under Chapter 11 of the United States Bankruptcy Code. Quick Fill owed $18,120.44 on the open account. Kraft Foodservice filed an action to enforce Hardee's personal guaranty. The trial court entered summary judgment for Kraft Foodservice. The North Carolina Court of Appeals reversed, holding that the guaranty was special and extended only to Seaboard Foods and was not enforceable by Kraft Foodservice as Seaboard's successor or assignee. The North Carolina Supreme Court reversed the decision of the Court of Appeals, holding that the guaranty was assignable and enforceable by Kraft Foodservice as Seaboard's assignee.

■ The North Carolina Supreme Court discussed the difference between a special and a general guaranty. The court elaborated that a special guaranty usually contemplates a trust in the person to whom it is addressed. It was noted that state courts are split on the issue of whether a guaranty addressed to a corporation may be enforced by the corporations's successor. *Kraft*, 457 S.E.2d at 598 (citing 38 C.J.S. *Guaranty* § 41(b)(1), at 1186 (1943)). Relying on prior law, the North Carolina Supreme Court held that the rights under a special guaranty are assignable unless: the assignment is prohibited by statute, public policy, or the terms of the assignment; the assignment would materially alter the guarantor's risks, burdens or duties; or the guarantor executed the contract because of personal confidence in the obligee. It stated that such a rule "is consistent with the common law of contracts, accommodates modern

business practices, and fulfills the intent of the parties to ordinary business agreements." *Id.* at 348, 457 S.E.2d 596, 598-99.

■ The reasoning of the North Carolina Supreme Court in *Kraft Foodservice* is also consistent with the *Restatement (Third) of Suretyship and Guaranty* § 13 (1996), which provides in part:

> (1) The rights of the obligee against the secondary obligor arising out of the secondary obligation can be assigned unless:
>
>> (a) the substitution of a right of the assignee for the right of the obligee would materially change the duty of the secondary obligor or materially increase the burden or risk imposed on it by its contract; or
>> (b) the assignment is forbidden by statute or is otherwise ineffective as a matter of public policy; or
>> (c) the assignment is validly precluded by the contract.

■ Based on the Restatement and the reasoning of *Kraft Foodservice*, we conclude that the appellee, as Leprino Foods' assignee, could enforce the appellants' personal guaranties. The terms of the guaranty contracts do not prohibit assignment, nor does public policy or any statute preclude assignment under these facts. Leprino Foods' assignment of the guaranties to Multifoods does not alter appellants' obligations. Appellants vowed to be personally liable if BSG failed to pay its debts on the open account. The assignment merely substituted the payee. There is also no evidence that the Thurmans executed the guaranties based on personal confidence they had in Leprino Foods. The guaranties were executed so that BSG Foods could purchase products on a open account. Even after Leprino Foods assigned its assets to Multifoods, BSG continued to purchase goods from Multifoods on the open account.

Accordingly, we affirm the trial court's grant of partial summary judgment to appellee.

ROBBINS and BIRD, JJ., agree.